1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SPENCER EARL ROGERS,                    Case No.  1:20-cv-00142-JLT-HBK (HC)

12                    Petitioner,            FINDINGS AND RECOMMENDATIONS TO
                                             DENY FIRST AMENDED PETITION FOR
13          v.                               WRIT OF HABEAS CORPUS AND TO
                                             DECLINE TO ISSUE CERTIFICATE OF
14   CHRISTIAN PFEIFFER,                     APPEALABILITY[1]

15                    Respondent.            FOURTEEN-DAY OBJECTION PERIOD

16                                           (Doc. No. 14)

17

18          Petitioner Spencer Earl Rogers ("Petitioner" or "Rogers"), a state prisoner proceeding

19   with counsel, has pending a First Amended Petition for writ of habeas corpus under 28 U.S.C. §

20   2254.  (Doc. No. 14).  The First Amended Petition raises two grounds for relief:  (1) the

21   admission of testimonial hearsay by the prosecution's gang expert and trial counsel's failure to

22   object to the admission of the inadmissible evidence violated Petitioner's Fourteenth and Sixth

23   Amendment rights to confrontation and effective assistance of counsel; and (2) California Penal

24   Code § 3051, which make offenders under the age of 25 sentenced to life without parole

25   ("LWOP") ineligible for youth offender parole hearings, violates Petitioner's rights to equal

26   protection under the Fourteenth Amendment and protection against cruel and unusual punishment

27   ────────────────────
     [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
28   (E.D. Cal. 2022).

                                               1

under the Eighth Amendment  (*Id*. at 7).  For the reasons set forth below, the undersigned recommends the district court deny Petitioner any relief on his First Amended Petition and decline to issue a certificate of appealability.

## I.  BACKGROUND

### A.  Procedural History

Rogers initiated this case on January 28, 2020 by filing a pro se petition for writ of habeas corpus.  (Doc. No. 1).  On March 25, 2020, the previously assigned magistrate ordered Petitioner to show cause why the initial petition should not be dismissed for failure to exhaust.  (Doc. No. 5).  In response, Petitioner filed a motion to stay the petition pending exhaustion of his second ground for relief.  (Doc. No. 6).  On June 11, 2020, the previously assigned magistrate issued findings and recommendation to deny Petitioner's motion to stay for lack of good cause.  (Doc. No. 8).  On October 5, 2020, counsel filed a notice of appearance on Petitioner's behalf.  (Doc. No. 10).  On November 17, 2020, this case was reassigned to the undersigned.  (Doc. No. 11). On March 10, 2021, Petitioner filed a notice that the California Supreme Court had rendered a decision on the unexhausted second ground for relief.  (Doc.  No. 12).  Because the district court had not yet adopted the June 11, 2021 findings and recommendations, the undersigned vacated the findings and recommendation, dismissed the pending motion to stay as moot, and ordered Petitioner to file a First Amended Petition.  (Doc. No. 13).  On March 11, 2021, Petitioner filed a First Amended Petition and the Court ordered Respondent to file a response to the Petition.  (Doc. No. 14).  Respondent filed an answer to the Petition on May 7, 2021 and lodged the pertinent state court record.  (Doc. Nos. 20, 21).  After being granted three extensions of time, Petitioner filed a reply to the answer on September 2, 2021.  (Doc. No. 29).  This matter is deemed submitted on the record before the Court.

### B.  Facts Based Upon the State Court Record

In 2015, a Kern County jury convicted Petitioner of the following offenses that occurred on or about March 2, 2013: (1) first degree murder committed for the benefit of a criminal street gang, which was perpetrated by means of lying in wait and by means of discharging a firearm from a motor vehicle and which was carried out while defendant was an active participant in a

criminal street gang and to further the activities of the gang, and in the commission of which defendant personally discharged a firearm, proximately causing great bodily injury or death; (2) premeditated attempted murder committed for benefit of a criminal street gang, in the commission of which defendant personally discharged a firearm, proximately causing great bodily injury or death; (3) felon in possession of a firearm committed for the benefit of a criminal street gang; (4) misdemeanant in possession of a firearm committed for the benefit of a criminal street gang; (5) active participation in a street gang, in the commission of which Petitioner used a firearm and personally inflicted great bodily injury upon two individuals; and (6) discharging a firearm at an occupied motor vehicle committed for the benefit of a criminal street gang.  On the same date, the Kern County jury convicted Petitioner of the following offenses that occurred on or about July 28, 2013: (1) two counts of premeditated attempted murder committed for benefit of a criminal street gang, in the commission of which defendant personally discharged a firearm, proximately causing great bodily injury or death; (2) felon in possession of a firearm committed for the benefit of a criminal street gang; (3) misdemeanant in possession of a firearm committed for the benefit of a criminal street gang; (4) two counts of assault with a semiautomatic firearm committed for the benefit of a criminal street gang; and (5) active participation in a criminal street gang, in the commission of which Petitioner used a firearm and personally inflicted great bodily injury upon two individuals.  (Doc. No. 21-1 at 2-4).  Petitioner was sentenced to life in prison without the possibility of parole plus multiple consecutive indeterminate terms.  (*Id*. at 4).  After striking the lying in wait special circumstance, the California Court of Appeal affirmed Petitioner's convictions and judgment.  (*Id*.).  The California Supreme Court denied review.  (Doc. No. 21-8).

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Court of Appeal.  A presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

////

////

////

3

1

**FACTS**

2

*Evidence Related to Events of March 2*

3   As of March 1, Laverne Taylor and defendant had been dating for
    several months.[4] Both lived in Bakersfield at the time, though not
4   together. On or about March 1, Taylor purchased a Chevrolet
    Cobalt. Defendant borrowed the car the next night or the night after.
5   He left about 10:00 p.m. and returned around 3:30 or 4:00 a.m.
    Taylor did not go with him.

6

7       [FN 4] Taylor—who grew up "in the Country," i.e., the
        south side—only dated Country Boys. When she and
8       defendant were dating, defendant had a number of tattoos.
        One read "CBC." Although defendant never told Taylor
9       what it meant, she knew it stood for Country Boy Crip.
        There were two X's inside the B. Those stood for "Blood
10      Killer." Defendant never told Taylor he was a member of
        the Country Boy Crips, but she knew he was, based on
11      where she met him and whom he was with.

12   Around 2:20 a.m. on March 2, Andrew Ward (also known as Baby
     G) and Kevin McMahan (also known as Kev Mac) arrived at the
13   Valero gas station on the corner of California Avenue and Union
     Avenue, Bakersfield, in McMahan's car. McMahan was driving.
14   When they left a short time later, McMahan turned onto Union
     Avenue.

15   Ward was looking down and texting on his cell phone when he
     heard more than five gunshots. He ducked down in the vehicle, but
16   was struck once in his lower back. When the shots stopped, he sat
     back up. The car was still moving, and he had to pull McMahan's
17   foot off the pedal.

18   Ward flagged down a friend he knew from school, who happened to
     be passing through the area with another person. Unable to do much
19   for McMahan, who was unconscious and bleeding badly, the friend
     took Ward to Kern Medical Center.

20

21   At approximately 2:30 a.m., the Bakersfield Police Department
     received multiple 911 calls. The initial call reported four
22   individuals running around a vehicle at State Highway 58, just east
     of South Real Road.[5] They had blood on them and appeared to be
     trying to drag someone out of the car.

23

        [FN 5] Highway 58 runs into, and ends at, South Real Road.

24

25   Officer Littlefield arrived at the scene at approximately 2:36 a.m.
     McMahan was in the vehicle, lying with his feet in the driver's
26   compartment and his body extending partially out of the open
     passenger side door. There were multiple fresh bullet strikes on the
27   driver's side of the vehicle and in the back of the driver's seat; an
     expended bullet in the driver's side rear tire, which was flat; and a
28   spent, deformed bullet near the rear of the car. The car was in the
     road, facing west and still running. Ward was not present.

4

1
2
3

Between the car and the Hughes Lane overpass, which was three-quarters of a mile east of the vehicle, officers located 14 nine-millimeter and five .22-caliber shell casings. The closer the shell casings were to the Hughes Lane overpass, the closer together they were found. They were more sporadically spaced nearer the car.

4
5
6

When the car was processed, it was determined the bullets traveled rear to front and left to right toward the vehicle. Seven bullet projectiles or fragments were recovered from the vehicle. The shell casings were processed for fingerprints. None were found.

7
8
9
10

McMahon was shot three times. One bullet penetrated the left arm, another penetrated the left thigh, and the third penetrated the right lower back. None of the bullets exited the body, and all were recovered during the autopsy. All three wounds were fatal, as they penetrated major arteries and, in the case of the bullet to the back, resulted in extensive bleeding into the peritoneal cavity. The cause of death was penetrating gunshot wounds to the trunk.

11
12
13
14
15
16
17
18
19

A little while after defendant returned with Taylor's car, Taylor's sister told Taylor about a shooting that had happened on Highway 58. Shortly after, Taylor's brother said defendant had done the drive-by shooting in Taylor's car. When Taylor questioned defendant about it, he first denied doing anything. Eventually, however, he said he and Chris H. (Chris) were at a club by the freeway, and "Skeet's" (Walter Goodson's) car and "Lil Critter" "block[ed] the car or something," then "they rolled up" on McMahan and shot him on the freeway entrance.[6] Defendant said he was the driver, but he was also shooting with his .38. Then he moved Chris to the side, took a "chopper"—an automatic weapon like an AK-47—from Chris, and shot that, too. Defendant said he left a cell phone at the scene so the authorities would think the perpetrator was someone from the West Side. Defendant said the .38-caliber revolver he used was hidden at his mother's rental property. Defendant subsequently bragged about the shooting on multiple occasions. He flew to North Dakota a couple weeks after the shooting.

20
21

[FN 6] For privacy, we use first names and/or initials for some individuals. No disrespect is intended.

22
23
24
25
26
27
28

On March 21, Officer Vaughan was assigned to the Special Enforcement Unit, also known as the gang unit. That evening, he stopped a red Chevrolet Cobalt being driven by Taylor. Taylor said she did not have any insurance because she had just purchased the vehicle. The car was seized and impounded. Taylor did not get the car back after that point. She was subsequently arrested for an unrelated matter and spent 13 days in jail. The day after her release, she also went to North Dakota. Taylor subsequently made several trips between North Dakota and Bakersfield, sometimes with defendant, and sometimes with other people. One of the trips from North Dakota to Bakersfield was made in a pearl white Subaru that Taylor had a friend rent for defendant. The Subaru had Montana license plates.

In 2013, D., a relative of Taylor, was living in Bakersfield. As of that time, she had known defendant one or two years. Sometime around June, D. (sometimes accompanied by her friend, K.) made several trips with Taylor between Bakersfield and North Dakota, where defendant was working. At one point, possibly in late July, defendant drove back with them. He was driving a white SUV-type car. D. did not notice any damage to the vehicle. When they returned to North Dakota about a week later, D. noticed a bullet hole in the vehicle. The hole had been patched. D. saw defendant with a firearm once or twice in North Dakota, both before and after this trip back. The gun D. saw before this trip was not the same gun she saw after. The one she saw before had a five-barrel object that could be pushed out and spun. The one she saw after had a laser on it.

On one occasion, defendant started talking to D. about "gangbanging and getting his stripes." He told D. he had killed "Kev Mac" to get his stripes in the gang. Defendant said he and someone named Chris, who had been driving, had caught "Kev Mac" and "Baby G" on a fluke on the freeway while defendant and Chris were just driving around. Defendant said McMahan and Ward "were some egg ni[* *]as, and they was caught slippin'." D. was aware that "egg" stood for East Side, and that East Side and Country were rival gangs. Defendant said he was from the Country. "[S]lippin'" meant they were out of their boundaries and not watching their backs, and they were in the wrong place at the wrong time. Defendant told D. there was his car and one other, and they blocked McMahan and Ward in. Defendant said he had his own gun, while the person he was with had an AK. They shot into McMahan's car, and defendant had a seizure when the gun went off.

Shortly after 2:30 p.m. on July 26, Taylor telephoned defendant and asked him to come to Enterprise Rent-A-Car to rent a car for her.[7] She explained a credit card was needed. Defendant agreed to do so, but said he needed to drop off a gun. He did not want to keep riding with it, because police were at the funeral and defendant did not want to just throw the gun away.[8]

[FN 7] In late July and early August, Officers Beagley and Champness were involved in an investigation of defendant. They obtained and listened to wiretaps, and coordinated and conducted surveillance. Recordings of a number of intercepted telephone calls were played for the jury.

[FN 8] According to Taylor, after she and defendant arrived in Bakersfield from North Dakota in the Subaru, defendant attended a funeral.

On August 6, Detective Dossey contacted M.G., who lived in North Dakota and was acquainted with defendant and Taylor, by telephone. When Dossey asked what defendant had told her, M.G. related that the car used in the shooting belonged to Taylor. There were two other people with defendant and Taylor. They were riding around, not even looking for McMahan, but rather looking for someone else. They were on the freeway and saw McMahan, and

6

the male in the backseat said, "Okay. Let me get 'im. Let me get 'im. There goes one of those East Side dudes" or "East Side ni[* * *]rs." But defendant said he grabbed the gun from the other man and said no, this was his time to put in his "work" for the "hood." Defendant said he shot and saw him go down.[9]

> [FN 9] At trial, M.G. denied discussing a shooting with defendant. She lied to the detective when she said defendant told her, because she was "having some issues" with defendant and Taylor. She was angry at them because Taylor had shot at her. S.C., an acquaintance who resided with M.G. in North Dakota until around August 4, told M.G. about the shooting, so M.G. told the detective what S.C. told M.G. There were also things M.G. did not recall telling Dossey. She felt her inability to recall was caused by her drug use, as was her making a false accusation against defendant. Had she been in her right state of mind, she would not have listened to anything S.C. said.

Taylor denied ever shooting at M.G.

### Evidence Related to Events of July 28

C.P. drove to Anthony Lyons's house on South Brown, in her white BMW, around 8:30 or 9:00 p.m. on July 27.[10] Aside from Lyons, the only other person there was Larry Lynch, who was sitting inside a silver or green Suburban. C.P.'s car was parked toward the driveway of the house next door, while the Suburban was parked directly in front of her car and directly in front of Lyons's residence. Lyons and C.P. remained outside, talking. Lyons was sitting on the driver's side hood of the BMW, while C.P. was standing in the street directly in front of him.

> [FN 10] Although the prosecutor's questions suggested this occurred on July 28, it appears he failed to distinguish between before and after midnight.

Sometime after 9:00 p.m., C.P. and Lyons went to the store. When they returned, they resumed their original places and started drinking. Lynch joined them for a while, then got back into the Suburban.

Meanwhile, early on the morning of July 28, Taylor, defendant, and "Chuckie" arrived at a Fastrip gas station in the Subaru. When a man who was at the station called Taylor a name, a fight ensued.[11] Defendant received a black eye. He, Taylor, and Chuckie then went to a party on Bradshaw. Chris was there. He and defendant spoke, then Chris went around the corner, got someone, and came right back. When he drove up, he told defendant that the person with him wanted to go with defendant. That person got in the Subaru with defendant, and defendant "zoomed off."

> [FN 11] At 2:27 a.m. on July 28, the Bakersfield Police Department received a call for service from the Fastrip at Ming and South Chester, in Bakersfield. The caller reported

a fight among six to eight Black individuals, some of whom were "jumping" others. Those involved were gone by the time police arrived. Cell phone data was consistent with defendant's cell phone being at the Fastrip at the time of the incident.

During the time C.P. and Lyons were at C.P.'s car, a vehicle occasionally came down the street. At some point, a car came up the street from behind C.P. She heard several gunshots, and she and Lyons both ran. C.P. made it as far as the middle of the car, then fell to the ground, wounded. The car from which she thought the shots came was white and looked "kind of like an SUV." She had not seen it earlier that night. C.P., who was shot in the back, leg, and foot, did not see anyone shooting at the white vehicle.

At 3:07 a.m., the Kern County Sheriff's Department received a 911 call from a male subject who reported that medical aid was needed for the victim of a shooting at an address in the 500 block of South Brown. Officer Messick arrived at the South Brown location less than five minutes after the call. Lyons, who was angry and upset, said he had been shot. He showed Messick a gunshot entry wound to his left buttock. Lyons said the shots came from a white compact SUV. Cell phone data could not exclude defendant's cell phone from having been at or near the South Brown location just prior to the time of the 911 call.

Messick located five .380-caliber shell casings and three .45-caliber ACP shell casings in the roadway. He searched the Suburban for a firearm, but none was found. Lynch denied having a firearm.

Defendant returned to the party in the Subaru about 10 to 15 minutes after he left. The other person was now driving. Defendant wrapped a gun in a sweater and gave it to Justin H. (Justin). Defendant instructed Taylor to drop Chuckie and the person who had gone with defendant, at home. Defendant and Justin headed to the backyard.

Taylor met back up with defendant at her mother's house, which was off Cottonwood, in "the Country." Once there, Taylor allowed her cousin to use the vehicle. Defendant said she should not have done that, because he had just done a drive-by, and the vehicle took a round to the back.[12] Defendant said he believed the person who was with him ran a red light coming back, and the camera or something "flashed" him. In describing the shooting, defendant said he hit a girl first, then hit a guy on South Brown. Unlike the Highway 58 shooting, defendant never really talked about the South Brown shooting again.

> [FN 12] Taylor subsequently saw the hole in the back of the Subaru. Defendant patched it first thing in the morning after the drive-by.

At approximately 11:30 a.m. on July 28, a telephone call between defendant and a female believed to be his mother was intercepted. In it, the woman advised defendant to put some antibiotic ointment

8

around his eye so it did not get infected. When she asked why he was out fighting the night before, he explained that someone "hopped on" Rodney, and defendant was trying to get them off Rodney. When the woman commented that there were a lot of police going "out that way," defendant asked, "Where, to the country?" The woman responded that that was where it looked like they were headed.

At approximately 5:00 p.m. on July 28, Officer Williams, who was involved in the investigation of defendant, received information concerning defendant's location. Williams observed defendant to be the sole occupant and driver of a white Subaru with Montana license plates.

Just after 9:00 a.m. on July 29, a telephone call from an unknown male to defendant was intercepted. At one point, defendant said "we" were on Brooks right then, that they were trying to hurry up and get out of there, and that defendant was trying to get on his way. At another point, defendant said they "got a rental," and he wished they could fly. Defendant also mentioned being at the Fastrip and "squabbing" with some people. Later, he said, "hey check this out though cuz we smashin it on the egg went to the SB cuz and that shit was tight cuz, we were over there and all them chicks and them ni[* *]as bust back and hit the car." He was laughing when he said this.

Defendant and Taylor left for North Dakota two days after the South Brown shooting. On the way, defendant told Taylor that when he fixed the hole in the Subaru, he went back and dug up the gun. This was the .380 used in the drive-by shooting on South Brown.

In early August, D. and Taylor were at the Oasis, a hotel in North Dakota, when the local police arrived and seized the SUV because the rental agreement had expired. The police allowed Taylor to get her personal items out of the vehicle. Taylor was concerned there may have been a gun in the car. She looked for it, but could not find it. She telephoned defendant to see if he had it.[13] This was the gun used in the South Brown shooting.

> [FN 13] Shortly after 11:00 a.m. on August 2, law enforcement intercepted a telephone call from Taylor to defendant's cell phone. At one point, Taylor said, "Tell me you didn[']t have that thing in that car because I checked behind the glove compartment and couldn't find it." Defendant responded that he had it.

The local police had been informed by Dossey that the vehicle had possibly been involved in a shooting. The Subaru was impounded and then searched. The bumper that had the patched hole in it was removed, and a bullet was found behind the hole, on the inside of an air intake vent. The bullet was consistent with .45-caliber ballpoint ammunition. There were also dents in the vehicle that were consistent with the bullet ricocheting after entering the vehicle and then pushing metal outward. There was also a second hole that

appeared to be a gunshot entry, where someone shot from behind the vehicle. Also found in the vehicle was a receipt bearing defendant's name.

On August 8, the police and a federal narcotics task force came to the Select Inn, where defendant and Taylor were staying in North Dakota. Special Agent Hill of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) searched a black suitcase that was in the room.[14] Inside, he found, among other items, men's shorts and an empty magazine that would fit a .380-caliber handgun. Inside a red suitcase, Hill found paperwork bearing defendant's name, as well as a receipt from Alamo Rent A Car for a white Subaru Outback registered in Montana. Also in that suitcase was a black leather purse that belonged to Taylor. It contained a holster, some loose ammunition, and two handguns. One of the handguns, to which the ammunition and holster were connected, was a Smith & Wesson Bodyguard model, .380-caliber, semiautomatic pistol with a built-in laser sight. The other firearm was a Charter Arms Bulldog model, .44-caliber, five-shot revolver. Both pistols were loaded. Inside a hygiene kit in the room were two 50-round boxes of .44-caliber ammunition, five rounds of which were missing from one of the boxes, and several prescription bottles bearing defendant's name.[15] Inside a red duffel bag, officers located drug paraphernalia (including a digital scale and what appeared to be a ball of methamphetamine) and female clothing.

> [FN 14] When officers entered, D. and K. were inside the room, but defendant was not present.

> [FN 15] According to Taylor, defendant took an antiseizure medication daily, as he had epilepsy.

Subsequent testing showed the five .380-caliber shell casings found at the scene of the shooting on South Brown were fired from the .380 semiautomatic firearm located during the search of defendant's hotel room.

### *The Gang Expert's Testimony*

Officer Malley had extensive training and experience with respect to criminal street gangs in Kern County, including numerous personal contacts with gang members. He explained that the Country Boy Crips and East Side Crips are the two biggest rivals in Bakersfield.[16]

> [FN 16] Because defendant expressly does not challenge that the Country Boy Crips constitute a criminal street gang within the meaning of section 186.22, we omit much of Malley's testimony concerning that subject.

The Country Boy Crips often refer to themselves as South Side Crips or being from the South Side. Their traditional territory is southeast Bakersfield, with Union Avenue as the west border, Cottonwood as the east border, East Belle Terrace as the north border, and East White Lane as the south border. Two of their

common symbols are CBC, which stands for Country Boy Crips; and ESK, which stands for East Side Killer. The primary criminal activities of the gang include murder, assault with a deadly weapon, robbery, carjacking, burglary, criminal threats, witness intimidation, illegal firearm possession, vehicle theft, and narcotic sales.

East Side Crip territory is the central part of East Bakersfield, immediately north of Country Boy Crip territory. East Side Crip territory is East Belle Terrace and everything north to East California, with Union Avenue as the west boundary and Washington Street as the east boundary. "[E]gg" and "eggshell" are derogatory terms for East Side Crips.

A portion of Highway 58 is in East Side Crip territory, but where Highway 58 ends at South Real Road is not in the traditional territory of a gang. The Valero station at Union and California is in West Side Crip territory, just across Union from East Side Crip territory. The area of the party on Bradshaw is in Country Boy Crip territory. The Fastrip on South Chester is just outside Country Boy Crip territory. Country Boy Crips commonly can be found there.

Malley had several contacts with Justin and his brother, Chris. As one of the offenses demonstrating the primary activities of the Country Boy Crip gang and the pattern of criminal activity, Malley described an incident that took place on January 19, 2008, in which defendant and Justin acted in concert to commit a carjacking within Country Boy Crip territory.[17] When arrested a few blocks away, defendant was wearing a powder blue T-shirt, which he admitted was the color of the Country Boy Crips. He also admitted having family in the gang, and having associated with the gang all his life. Defendant identified Justin as a Country Boy Crip and his second cousin. Defendant pled no contest to being an accessory, while Justin pled no contest to carjacking. Each received a prison term. The incident was significant to Malley, because carjacking is one of the primary activities of the gang. In addition, defendant admitted his affiliation with the gang and committed the crime with another Country Boy Crip. In Malley's opinion, Justin was a Country Boy Crip. Malley based this on past contacts with Justin, in which Justin was in the company of other Country Boy Crips. Malley also based this on defendant's statement that Justin was a Country Boy Crip, together with Malley's parole search of Justin's cell phone, in which were photographs of Justin throwing Country Boy Crip hand signs and Justin with other Country Boy Crips. Malley opined Chris also was a Country Boy Crip, based on Chris's admission to Malley that he was a Country Boy Crip, the fact Malley had contacted him in the company of other Country Boy Crips, and parole searches of Chris's person and vehicle.

> [FN 17] Malley had never contacted defendant in person, but became familiarized with him through the wiretap operation as well as documentation Malley reviewed in preparation for court.

Malley became familiarized with Goodson through the wire investigation, as well as through searches he had conducted on

11

Goodson's home and contacts he had with Goodson from the wire investigation. On September 21, 1997, Goodson drove two other Country Boy Crips into East Side Crip territory. One of his passengers fired multiple rounds into a crowd of people, killing one person. The homicide was committed in retaliation for an earlier shooting in which Goodson and one of his passengers were shot at by East Side Crips. Witnesses and informants all identified Goodson and the other two perpetrators as Country Boy Crips. All three either pled no contest or were convicted of various offenses and were sentenced to prison. The incident was significant to Malley because it involved a group of Country Boy Crips aiding each other in committing a primary activity, and it was committed within rival East Side Crip territory. Based on this incident, Goodson's gang-related tattoos, his jail booking admissions, and his street checks and offense reports, Malley opined he was an active Country Boy Crip, including as of March 2.

Malley was familiar with Lyons, having had contacts with, and talked to, him before. Malley knew Lyons to be an East Side Crip gang member. In addition, Malley had searched Lyons's house on South Brown (which was in East Side Crip territory) on several occasions during probation searches, the most recent five or six months before trial. Malley believed Lyons was an East Side Crip because of Lyons's own admissions, his gang tattoos, the fact he was arrested for gang crimes that were consistent with the activities of the East Side Crips, and reports and street checks Malley reviewed concerning Lyons's contacts with the police that contained evidence Lyons was a gang member. Aside from her affiliation with Lyons, C.P. had no gang affiliations of which Malley was aware.

Malley was familiar with Ward, and had several prior contacts with him in which they talked about Ward's gang membership and Ward admitted he was an East Side Crip. Malley had also searched Ward's parole address, person, and vehicle multiple times, and reviewed documentation on Ward before coming to court. Ward was an East Side Crip member from the Stroller Boy Crip subset, and had Stroller Boy and anti-Country Boy Crip and anti-West Side Crip tattoos. At the time he testified, Ward had a Highway 58 sign with "East" over it tattooed on his arm. Malley knew Ward did not have that tattoo before McMahan was killed, and opined it was a memorial tattoo for McMahon.

Malley was familiar with McMahan, having pulled him over in his vehicle two to three times, conducted searches of his vehicle and his person per his parole and probation status, and having reviewed materials about his gang membership in preparation for court. McMahon was an East Side Crip from the Spoonie Gee subset. Malley based this opinion on McMahan's admissions, tattoo, and the documentation.

Malley opined that defendant was a Country Boy Crip. The predicate offense committed by defendant and Justin was one factor in this opinion, because defendant was with another documented Country Boy Crip, they committed a crime that was one of the primary activities of the gang, defendant made admissions about his

12

affiliation and identified Justin—his cousin—as a Country Boy Crip, the offense was committed within Country Boy Crip territory, and defendant and Justin were acting together at the time. In addition, defendant had a "CBC" tattoo. The letters stood for "Country Boy Crip" and the tattoo was an "obvious gang identifier." The fact the letter B was crossed out twice in the tattoo was an open sign of disrespect for Blood gang members, who are rivals to Crips, and so was also an obvious indication it was a gang tattoo.

Malley also reviewed defendant's booking records. Between 2008 and 2014, defendant claimed Country Boy Crips 10 times, requested to be kept away from the Bloods nine times, and requested to be kept away from the East Side once.

In addition, Malley looked at offense reports that were generated by law enforcement agencies to document crimes, and at street checks, which are done for intelligence purposes. One street check was from March 25, 2013, when defendant was a passenger in a car with a documented Country Boy Crip associate. It was significant to Malley because defendant was contacted with someone who identified with the Country Boy Crips.

Another street check was from October 28, 2012. An officer contacted defendant at Kern Medical Center after he was shot. The deputy who was there at the time told the officer that defendant told him the shooting was gang related because defendant was an active Country Boy Crip. The deputy also noted defendant had a CBC tattoo on his arm.

On May 22, 2012, defendant was contacted within Country Boy Crip territory in the company of five documented Country Boy Crip members. Several of these individuals were required to register as Country Boy Crips.

Another street check, from September 24, 2008, reported defendant was contacted within Country Boy Crip territory in the company of another Country Boy Crip member. Defendant was wearing powder blue shoes at the time. The officers noted defendant did not live within the boundaries of the gang, but was repeatedly contacted there. This was significant to Malley because, although defendant's residence was not near Country Boy Crip territory, he still went out of his way to associate with people from that area, and he went to that area to associate with them.

On August 17, 2008, defendant was contacted as a vehicle passenger. Justin and another Country Boy Crip member were also in the vehicle.

On July 13, 2008, defendant was stopped while in a vehicle just outside of Country Boy Crip territory. With him were Justin and another Country Boy Crip member.

On July 11, 2008, defendant was contacted with Justin and another Country Boy Crip member. In the street check, it was noted that all three affiliated with the Country Boy Crips.

One offense report was from March 8, 2013. Defendant was contacted at a motel in Bakersfield when officers went there to conduct a probation search of Taylor's motel room. Defendant's cell phone was searched; it was found to contain phone numbers and monikers for several Country Boy Crip gang members, as well as photographs of defendant with Country Boy Crip members.

Another offense report was dated January 2, 2011. On that date, officers responded to a call from service at a bar. Defendant was contacted in the company of two other Country Boy Crips.

On October 24, 2010, officers searched defendant's bedroom. They found photographs of Country Boy Crip members. They also found letters that discussed gang politics as well as the recent arrest of Country Boy Crips. There were signs and symbols in the letters that represented the gang. A scale with marijuana residue and packaging was also located inside the bedroom.

On July 29, 2009, defendant was found trespassing on a commercial business property after a burglar alarm went off at the business. Malley found the incident significant because burglary is a primary activity of the Country Boy Crips and defendant possibly was involved in burglary activity at the time.

Based on the totality of the foregoing information, Malley opined that defendant was a Country Boy Crip. He further opined that, on March 2 and July 28, defendant was an active participant in the gang.

Defendant's intercepted telephone calls were significant to Malley's opinion. In the one on July 26, in which Taylor asked him to come to Enterprise and rent a vehicle, defendant spoke of dropping off a gun to avoid police contact with that firearm in his vehicle. This was significant, because the funeral defendant referenced was for a Country Boy Crip who had been murdered by an East Side Crip a week or two earlier. It is common for the gang unit to conduct high-visibility patrols around funerals of gang members to ensure there is no retaliation.

In the call between defendant and possibly his mother, in which defendant mentioned Rodney, it was Malley's opinion defendant was talking about Rodney R., who was a Country Boy Crip. Under the gang's code, defendant would be required to help defend another gang member if that person was being assaulted.

In the call defendant received on the morning of July 29, in which he spoke of "squabbing" at the Fastrip, defendant said, "we smashin it on the egg...." Malley explained that this meant going to East Side Crip territory to assault or shoot East Side Crip gang members. Defendant also said, "we were over there and all them chicks and them ni[* *]as bust back and hit the car." Malley explained that

"bust" meant to use a firearm. When defendant said "bust back," he was saying, " 'We shot and then they shot back at us and hit our car.' " Defendant referred to going "to the SB," which was an acronym for South Brown, the location in East Side Crip territory where the shooting occurred. The caller asked, "for reals?" Defendant responded, "on country." This meant defendant basically was "putting it on the gang." By itself, this essentially showed defendant was a Country Boy Crip, since it would not make sense for him to put something on the gang if he was not from that gang. When defendant subsequently said he "already smacked one down," this meant that before someone shot back at the car, defendant knocked someone over with gunfire. Malley opined this could refer to the South Brown shooting before the car was shot, or it could mean another offense sometime in the past.

In a call on July 29, defendant asked the other person what happened. The person replied that someone "just bust on Bradshaw," but did not hit anything. This was a discussion about a shooting in retaliation for the one on South Brown the day before. It was also significant that defendant and the other person referred to each other as "cuz," as that is a term Country Boy Crips use to refer to each other.

Based on Malley's experience and opinion, it would not be common for a Country Boy Crip to take someone unaffiliated with the gang along on a drive-by shooting. Malley explained there is trust between gang members. When they are caught by the police, it is expected by fellow gang members that they will not snitch or give a statement. In contrast, there is a big possibility someone who is not a gang member may snitch or give information to the police that leads to the gang member's arrest and prosecution. There is also a bond between gang members, and if someone goes with a Country Boy Crip to commit a gang-related shooting, that person basically is required to be someone who identifies with that gang. Malley further opined that a Country Boy Crip who bragged of committing a crime he did not commit, would face a penalty of a severe beating to even death. Malley learned this from speaking with Country Boy Crips on a daily basis and from speaking with informants who were Country Boy Crips.

Asked a hypothetical question based on the evidence presented concerning the March 2 shooting, Malley opined the activity would benefit the Country Boy Crips. It would be beneficial to the gang's reputation within gang culture by showing the Country Boy Crips were not fearful of their rivals and were willing to kill their rivals on sight and in public. It would also be beneficial because the Country Boy Crips were in an ongoing gang war with the East Side Crips, and in war, the objective is to kill the enemy. Moreover, multiple gang members working together showed a crime committed in association with the Country Boy Crips, because more than one member of the gang was working together in concert to execute a plan, and coming together to commit a crime that was within the primary activities of the gang.

15

> Asked a hypothetical question based on evidence presented concerning the July 28 shooting, Malley opined that activity also would benefit the gang by directly benefiting the gang's reputation. That Country Boy Crip members were willing to arm themselves and drive into rival territory to commit shootings at any time was beneficial to the gang because it struck fear into the rivals and into the public who have to live in the area. It also struck fear into the hearts of law enforcement who have to deal with members of the gang, and emboldened the gang as a whole. The fact someone not affiliated with a gang was hit would simply be considered collateral damage by the gang, and would not result in any penalty against the shooter.
>
> Malley explained that a violent reputation helps a gang commit its primary activities by furthering its ability to commit those activities. It intimidates people so they do not want to become witnesses, and makes gang crimes hard to solve and prosecute.

*People v. Rogers*, No. F072319, 2018 WL 3583757, at *2-11; (Doc No. 21-1 at 4-21).

## II. APPLICABLE LAW

### A. AEDPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then the AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and intentionally difficult to satisfy. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

16

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision. *White*, 572 U.S. at 419. Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

As discussed earlier, for the deferential § 2254(d) standard to apply there must have been an "adjudication on the merits" in state court. An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id.* at 1196.

> When . . . there is no reasoned state-court decision on the merits, the federal court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102. If such disagreement is possible, then the petitioner's claim must be denied. *Ibid.*

*Sexton*, 138 S. Ct. at 2558.

### III.  APPLICABLE LAW AND ANALYSIS

#### A.  Ground One: Confrontation Clause Violation

This Court reviews the last reasoned opinion—in this case, that of the California Court of Appeal. Because the Court of Appeal rejected Petitioner's claims on the merits, the deferential

18

1  standard of § 2254 applies.

2  **1. Background**

3  Rogers contends his Sixth and Fourteenth Amendment rights to confrontation were

4  violated when inadmissible evidence was presented through the prosecution's gang expert and his

5  counsel failed to object.  (Doc. No. 1 at 5).  Due to its brevity, the undersigned recites in full the

6  facts presented in support of ground one by Petitioner:

7  
> The prosecution's gang expert violated petitioner's right to
8  Confrontation by testifying to large amounts of testimonial and
> inadmissible hearsay in order to establish the elements of both the
9  substantive gang crime, and the gang enhancements charged against
> petitioner.  Trial counsel was ineffective for failing to object to the
10  admission of the inadmissible evidence and the trial court failed to
> protect petition by excluding the inadmissible evidence.

11  (Id. at 5).

12  In its Answer, Respondent cites in full the California Court of Appeal thorough opinion

13  rejecting Petitioner's confrontation and accompanying counsel-based challenge.  Respondent

14  argues the state court's findings applied correct Supreme Court precedent and were reasonable

15  and factually accurate.  (Doc. No. 20 at 21-29).  Respondent further correctly points out that

16  counseled Petitioner provides nothing more than "provide this court with a basic heading of his

17  appellate claim."  (*Id.* at 29).  Specifically, Petitioner fails to allege, yet alone, demonstrate that

18  the state court's "harmlessness-based rejection of the confrontation or derivative counsel-based

19  claims triggered an exception to 28. U.S.C. § 2254(d)'s re-litigation bar."  (*Id.*).  The undersigned

20  agrees.

21  Petitioner filed a 63-page reply to the Answer, 26 pages of which were devoted to this

22  ground for relief.  (Doc. No. 29).  Petitioner presented new arguments to support his claim,

23  including (1) the "vast majority" of the gang expert's testimony was inadmissible hearsay in

24  violation of the confrontation clause; and (2) the Court of Appeal's application of the *Chapman*

25  standard was unreasonable given the large amount of inadmissible evidence presented to the jury

26  by the gang expert and the lack of "credible evidence" supporting the charged gang offenses.

27  (Doc. No. 29 at 18-46).  Petitioner also reiterated his ineffective assistance of counsel claim was

28  not "abandoned," and argued only that "[b]ecause the Court of Appeal rested its ruling on the

1  issue of harmless error under *Chapman* that is the focus of the argument [in the reply]; however,

2  in the event this Court conducts a comprehensive analysis of the underlying errors, it should

3  consider both theories advanced by Rogers in his petition." [2] (*Id*. at 25).

4  ### 2. State Appellate Court Decision

5  In evaluating ground one, the undersigned considers the state appellate court reasoned

6  decision:

7  As summarized in the statement of facts, *ante*, Malley testified as
   the People's gang expert. His opinions were based on a combination
8  of, inter alia, his own training, experience, and contact with gang
   members; individuals' tattoos; jail booking admissions; and street
9  checks and offense reports.

10 Trial was held, and Malley testified, in 2015. The following year,
   the California Supreme Court issued its opinion in *People v.*
11 *Sanchez* (2016) 63 Cal.4th 665 (*Sanchez* ), in which it delineated
   the rules regarding expert reliance on, and relaying to the jury of,
12 hearsay, under both state law and *Crawford v. Washington* (2004)
   541 U.S. 36 (*Crawford* ).
13

   Defendant now contends the trial court incorrectly overruled one
14 purportedly significant hearsay objection raised by defense counsel,
   defense counsel rendered ineffective assistance by not objecting to
15 other instances of hearsay and testimonial hearsay, and, if counsel's
   performance was not deficient because *Sanchez*'s holding could not
16 reasonably be anticipated and/or any objection would have been
   futile, the issue nevertheless is cognizable on appeal as trial court
17 error. Defendant says he is entitled to reversal of the gang-murder
   special circumstance (§ 190.2, subd. (a)(22) ), the gang
18 enhancements (§ 186.22, subd. (b) ), and counts 5 and 12 (the
   counts charging active participation under § 186.22, subd. (a) ). We
19 conclude defendant is not entitled to reversal.

20 **A. <u>Procedural Background</u>**

21 The People moved, in limine, to admit gang expert testimony and
   gang evidence. Prior to his removal as a codefendant, Goodson
22 moved for an Evidence Code section 402 hearing to establish the

23 ─────────────────────

24 [2] Petitioner's first ground for relief in the First Amended Petition also includes the conclusory statement
   that "the trial court failed to protect petitioner by excluding the inadmissible evidence."  (Doc. No. 14 at
   5).  As discussed *infra*, the Court need not consider this argument as Petitioner provides no elaboration or
25 factual support in the First Amended Petition.  Moreover, the state appellate decision recognized defense
   counsel made very few hearsay objections to Malley's testimony, and none under *Crawford*; however, the
26 state court declined to consider whether further objections on hearsay and/or confrontation clause grounds
   would have been futile because any error in admitting Malley's testimony was harmless under *Chapman*.
27 (Doc. No. 21-1 at 36-40).  Petitioner acknowledges this finding in his reply and appears to concede that "in
   keeping with the Court of Appeal's approach to the case, the focus here is the impact that the testimonial
28 hearsay evidence had at trial."  (Doc. No. 29 at 33).

qualifications of the People's gang expert. Defendant moved generally for the exclusion of out-of-court statements from nontestifying witnesses, pursuant to *Crawford*. With respect to the gang expert, he requested an Evidence Code section 402 hearing to allow the court to make a ruling as to the validity of the testimony, and to ensure the testimony and/or opinion was "(1) based on matter of a type [on] which the expert may reasonably rely, (2) based on reasons supported by the material in [*sic*] which the expert relies; and (3) is not speculative." The trial court denied the *Crawford* motion as being overly broad, but did so without prejudice. Defense counsel stated that he understood the court's concern, and would notify the court if the situation arose. The court granted both defendants' requests for Evidence Code section 402 hearings, focused primarily on Malley's qualifications and the foundation for his opinions.

During his trial testimony, Malley stated he had never before contacted defendant in person. He became familiarized with defendant through his in-the-field work on the wiretap operation, as well as through the documentation he reviewed in preparation for court. As one of the offenses used to demonstrate the primary activities of the Country Boy Crips as well as the pattern of criminal activity, Malley recited the facts of a 2008 offense in which defendant and Justin committed a carjacking, and following which defendant admitted to police that he had associated with the Country Boy Crips all his life and identified Justin as a Country Boy Crip. When subsequently asked by the prosecutor about the basis for his opinion Justin was a Country Boy Crip, Malley said it was based, in part, on defendant's admission of that fact in conjunction with his arrest for the 2008 offense. Defense counsel objected on hearsay grounds; when the prosecutor responded that Malley was relying on the statement for his opinion, the objection was overruled. The defense's hearsay objection was also overruled when made in response to Malley's use of defendant's 2008 statement as a basis for Malley's opinion as to whether defendant was a Country Boy Crip.

During Malley's recitation of street checks involving defendant, Malley testified that on October 28, 2012, an officer contacted defendant at Kern Medical Center after defendant was shot. The deputy who was at the hospital told the officer that defendant told him the shooting was gang related, because defendant was an active Country Boy Crip. Defense counsel objected on hearsay grounds, but the prosecutor again responded that Malley was relying on it for his opinion. The court told the jury: "Ladies and gentlemen, the Court would otherwise sustain the hearsay objection, but it's going to allow this witness to rely on what's categorized as reliable hearsay on the basis of forming his ultimate opinion. You can consider the information just as it relates to this witness's opinion, but you cannot consider it for the truth of the matter asserted. So you can consider the statements made in the previous answer for that limited purpose only."

Defendant did not object, on hearsay or *Crawford* grounds, to any of the other portions of Malley's testimony.

**B. <u>Analysis</u>**

If a witness is testifying as an expert, his or her opinion may be "[b]ased on matter ... perceived by or personally known to the witness or made known to him [or her] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion...." (Evid. Code, § 801, subd. (b).) Generally speaking, such permissible basis evidence includes hearsay. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 366.)

As previously described, hearsay—extrajudicial statements offered to prove the truth of the matter asserted—is inadmissible except as provided by law. (Evid. Code, § 1200.) Moreover, if a hearsay statement is "testimonial," it generally cannot, consistent with the confrontation clause of the Sixth Amendment to the United States Constitution, be introduced against a defendant in a criminal trial unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him or her. (*Crawford, supra*, 541 U.S. at pp. 53-54.) From *Crawford* and the United States Supreme Court's opinion in *Davis v. Washington* (2006) 547 U.S. 813, the California Supreme Court has derived these basic principles:

"First, ... the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984, fns. omitted.)[21]

> [FN 21] The United States Supreme Court has since recognized that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony.... Where no such primary purpose exists, the admissibility of a statement is the concern of state ... rules of evidence, not the Confrontation Clause." (*Michigan v. Bryant* (2011) 562 U.S. 344, 358-359, fn. omitted.)

At the time of defendant's trial, California Supreme Court precedent permitted the type of expert testimony at issue here. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617-620 (*Gardeley* ).) Serious questions had been raised, however, concerning the continuing validity, post-*Crawford*, of the notion evidence forming the basis of an expert's opinion was not offered for its truth. (See, e.g., *Williams v. Illinois* (2012) 567 U.S. 50, 108-109 (conc. opn. of Thomas, J.); *id.* at pp. 125-133 (dis. opn. of Kagan, J.); *People v. Dungo* (2012) 55 Cal.4th 608, 627 (conc. opn. of Werdegar, J.); *id.* at p. 635, fn. 3 (dis. opn. of Corrigan, J.); *People v. Valadez* (2013) 220 Cal.App.4th 16, 31-32; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1129-1137; but see *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210.) In addition, the California Supreme Court had already granted review in *Sanchez*, formerly 223 Cal.App.4th 1, review granted May 14, 2014, S216681.

In *Sanchez*, the state high court addressed the interplay between basis evidence, the hearsay rule, and *Crawford*. The court observed: "The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise.... [¶] By contrast, an expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra*, 63 Cal.4th at p. 676.)[22]

[FN 22] The court provided the following example: "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Sanchez, supra*, 63 Cal.4th at p. 677.)

The court determined that in light of state hearsay rules and *Crawford*, "a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture [by wrongdoing], are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Sanchez, supra*, 63 Cal.4th at p. 680.)[23]

[FN 23] *Sanchez* disapproved *Gardeley, supra*, 14 Cal.4th 605, "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13.) It also disapproved a number of its

prior decisions that had concluded an expert's basis testimony is not offered for its truth. (*Ibid.*)

After examining United States Supreme Court and California authorities, the California Supreme Court "adopt[ed] the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez, supra,* 63 Cal.4th at p. 686, fn. omitted.) The court cautioned that it was not calling into question "the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field." (*Id.* at p. 685.) "Gang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code. They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven. They may also rely on nontestimonial hearsay properly admitted under a statutory hearsay exception." (*Ibid.*) An expert may still rely on hearsay in forming an opinion, "and may tell the jury *in general terms* that he did so." (*Ibid.*) What experts "cannot do is present, as facts, the content of testimonial hearsay statements." (*Ibid.*) "When the People offer statements about a completed crime, made to an investigating officer by a nontestifying witness, *Crawford* teaches those hearsay statements are generally testimonial unless they are made in the context of an ongoing emergency ..., or for some primary purpose other than preserving facts for use at trial. Further, testimonial statements do not become less so simply because an officer summarizes a verbatim statement or compiles the descriptions of multiple witnesses." (*Id.* at p. 694.)

There can be no doubt Malley conveyed some evidence to the jury that clearly was testimonial hearsay. (See, e.g., *Sanchez, supra,* 63 Cal.4th at pp. 694, 697 [police reports compiled about completed crime; "FI" cards produced in course of ongoing criminal investigation]; *People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1248-1250 [statements memorialized on "FI" cards prepared in course of investigation into potential crime].)[24] Defense counsel made very few hearsay objections, and none under *Crawford* that were specifically aimed at Malley's testimony, however.[25]

[FN 24] Booking admissions may or may not be testimonial. (Compare *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 415 with *People v. Leon* (2016) 243 Cal.App.4th 1003, 1018-1019, 1020.) In *People v. Elizalde* (2015) 61 Cal.4th 523, 531, 538-539, however, the state Supreme Court concluded that jail classification interviews are a form of custodial interrogation for purposes of the Fifth Amendment. Although defendant did not object at trial to

24

Malley's reliance on booking admissions, nor does he raise the issue on appeal, we will assume, for purposes of our prejudice analysis, *post*, that defendant's booking admissions should not have been presented to the jury.

[FN 25] Defendant's broad pretrial motion on *Crawford* grounds does not constitute a timely and specific objection to gang expert testimony, particularly where it was denied without prejudice. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 48; *People v. Blessett* (2018) 22 Cal.App.5th 903, 926-927, petn. for review pending, petn. filed June 8, 2018.) Moreover, the hearsay objections defendant did make did not preserve a *Crawford* claim. (See *People v. Rangel, supra*, 62 Cal.4th at pp. 1216-1217.)

It has long been settled that a timely and specific objection at trial—on the same ground—is necessary to preserve for appeal a claim of state law error in the admission of hearsay or a claim of confrontation clause violation. (E.g., *People v. Redd* (2010) 48 Cal.4th 691, 730; *People v. Harrison* (2005) 35 Cal.4th 208, 239; *People v. Carrillo* (2004) 119 Cal.App.4th 94, 101.) The duty to object will be excused, however, if an objection would have been futile. (E.g., *People v. McKinnon* (2011) 52 Cal.4th 610, 654; *People v. Carrillo, supra*, at p. 101.)

We decline to decide whether, in light of *Gardeley*'s holding and the fact the trial court overruled defendant's hearsay objection to the hospital street check, further objections on hearsay and/or confrontation clause grounds would have been futile. Such an undertaking would be an idle act on our part, since we are convinced any error with respect to admission of Malley's testimony was harmless.

*Crawford* error is assessed under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman* ). (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661; see, e.g., *Sanchez, supra*, 63 Cal.4th at p. 699.) State law error in the admission of hearsay is assessed under the reasonable probability standard of *Watson, supra*, 46 Cal.2d at page 836. (*People v. Duarte* (2000) 24 Cal.4th 603, 619.) Defendant claims prejudice with respect to whether he was an active participant in a gang and whether the crimes were gang related. These issues affect counts 5 and 12, the active participation charges under section 186.22, subdivision (a); the gang-murder special circumstance (§ 190.2, subd. (a)(22) ) appended to count 1; and the gang enhancements (§ 186.22, subd. (b) ) appended to counts 1 through 4, 6 through 11, and 13.

"[T]he elements of the gang offense [proscribed by section 186.22, subdivision (a) ] are (1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engaged in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. [Citation.] All three elements can

25

be satisfied without proof the felonious criminal conduct promoted, furthered, or assisted was gang related." (*People v. Albillar* (2010) 51 Cal.4th 47, 56 (*Albillar* ).) A person need not be a member of a gang to be guilty of violating section 186.22, subdivision (a) (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (lead opn. of Corrigan, J.) ), nor is mere membership in a gang enough to establish the offense (*Gardeley, supra*, 14 Cal.4th at p. 623). The person need not occupy a leadership position in the gang or devote a substantial part of his or her time and efforts to the gang, but must take part in a manner that is not passive. (*People v. Castenada* (2000) 23 Cal.4th 743, 747.) The defendant's active participation must be shown to have occurred at or reasonably near the time of the crime(s) (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509), and he or she must commit an underlying felony with at least one other gang member (*People v. Rodriguez, supra*, 55 Cal.4th at p. 1134 (lead opn. of Corrigan, J.).)

Section 190.2, subdivision (a)(22) mandates a sentence of death or life in prison without the possibility of parole where the defendant is convicted of first degree murder and the jury finds he or she "intentionally killed the victim while the defendant was an active participant in a criminal street gang ..., and the murder was carried out to further the activities of the criminal street gang." It "contains three basic elements: (1) the defendant must intentionally kill the victim; (2) while an active participant in a criminal street gang; (3) in order to further the activities of the gang." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 612.) As is the case with section 186.22, subdivision (a), "there is a constitutional requirement that, before a defendant can be penalized for being an active participant in a criminal organization ... the defendant must be shown to have had knowledge of the gang's criminal purposes." (*People v. Carr* (2010) 190 Cal.App.4th 475, 487.) "[T]he evidence that allows a jury to find a felony was committed for the benefit of a gang within the meaning of section 186.22, subdivision (b)(1), also typically supports a finding the defendant knew of the criminal activities of the gang.... [J]ust as a jury may rely on evidence about a defendant's personal conduct, as well as expert testimony about gang culture and habits, to make findings concerning a defendant's active participation in a gang or a pattern of gang activity, it may also rely on the same evidence to infer a defendant's knowledge of those activities. [Citation.]" (*Id.* at pp. 488-489, fn. omitted.)

A gang enhancement requires proof the defendant committed the substantive offense (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) "[T]he Legislature included [the first requirement] to make it 'clear that a criminal offense is subject to increased punishment ... only if the crime is "gang related." ' [Citation.] Not every crime committed by gang members is related to a gang." (*Albillar, supra*, 51 Cal.4th at p. 60.) A crime *is* gang related, however, if, inter alia, it is committed in association with the gang, or it is committed for the benefit of the gang. (*Ibid.*) A crime is committed in association with a gang where the perpetrators "relied on their common gang membership and the

apparatus of the gang" in committing the crimes. (*Ibid.*) Because the statute lists the requirements of the first prong in the disjunctive, if the crime was committed for the benefit of the gang, it need not have been committed in association with the gang, and vice versa.

With respect to the second, specific intent prong, "the scienter requirement ... is unambiguous and applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar, supra*, 51 Cal.4th at p. 66.) "There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members.* [Citations.]" (*Id.* at p. 67.)

In the present case, a significant amount of Malley's testimony did not run afoul of *Sanchez*, either with respect to state hearsay rules or with respect to *Crawford*. (See, e.g., *People v. Blessett, supra*, 22 Cal.App.5th at pp. 947-948; *People v. Iraheta, supra*, 14 Cal.App.5th at p. 1248; *People v. Vega-Robles, supra*, 9 Cal.App.5th at pp. 412-413; *People v. Valadez, supra*, 220 Cal.App.4th at pp. 35-36.) This admissible testimony included how the charged crimes benefited the Country Boy Crips. The wiretapped conversations—which not only were analyzed by Malley, but which were admitted into evidence and played for the jury (cf. *People v. Martinez* (2018) 19 Cal.App.5th 853, 858), and which presented none of the credibility problems defendant alleges with respect to Taylor and D.—demonstrated defendant's consistent involvement in the Country Boy Crips and that the July shooting was gang related. In addition, Taylor testified defendant was a Country Boy Crip, and the jury heard evidence of defendant's admissions to D. and M.G. concerning the gang-related purpose of the March shooting.

In light of all the properly admitted evidence, we conclude the trial court's error in admitting those portions of Malley's testimony consisting of case-specific hearsay and case-specific testimonial hearsay was harmless under either the *Watson* or the *Chapman* standard. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 821.)[26] Defendant is not entitled to reversal of the substantive gang crime convictions, the true findings as to the gang enhancements, or the true finding as to the gang-murder special circumstance.

> [FN 26] It follows that, were we to find the issue forfeited by defense counsel's failure to object, defendant's ineffective assistance of counsel claim would fail for lack of prejudice. To establish prejudice on such a claim, a defendant must show a reasonable probability—that is, " 'a probability sufficient to undermine confidence in the outcome' "—of a more favorable result absent counsel's shortcomings. (*People v. Cunningham, supra*, 25 Cal.4th at p. 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.) Where, as here, an error can be declared harmless beyond a reasonable doubt, no such probability exists.

1  *People v. Rogers*, No. F072319, 2018 WL 3583757, at *15-20; (Doc No. 21-1 at 30-40).

2  **3. Petitioner is not Entitled to Relief**

3  As an initial matter, Petitioner's first ground for relief is deficiently pled.  The First

4  Amended Petition fails to identify any unreasonable determination of facts; nor does it make any

5  argument whatsoever regarding the state appellate court's finding that the admission of any

6  inadmissible portions of the gang expert's testimony was harmless under the *Chapman* standard.

7  (*See* Doc. No. 14 at 5).  Similarly, Petitioner does not challenge the state court finding that any

8  ineffective assistance claim based on counsel's failure to object would fail for lack of prejudice

9  under *Strickland*.  As noted above, only on reply does Petitioner cite to specific portions of gang

10  expert's testimony he contends are inadmissible hearsay in violation of the confrontation clause,

11  and for the first time argues that the state appellate court's finding was unreasonable given the

12  large amount of inadmissible evidence presented to the jury by the gang expert and the lack of

13  "credible evidence" supporting the charged gang offenses.  (Doc. No. 29 at 18-46).

14  Pursuant to Rule 2(c) of the Rules Governing Section 2254 Cases in United States District

15  Courts, a habeas petition must specify all the grounds for relief available to the petitioner and the

16  facts supporting each ground.  Moreover, habeas claims raised for the first time in reply or

17  traverse need not be considered.  *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.

18  1994) ("A Traverse is not the proper pleading to raise additional grounds for relief."); *Zamini v.

19  Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("district court need not consider arguments raised for

20  the first time in a reply brief"); *Moore v. McVay*, 2023 WL 2541328, at *4 (N.D. Cal. Mar. 15,

21  2023) (district court "has discretion, but is not required to" consider claims raised in the traverse).

22  As noted by Respondent, the Court is also not required to construe Petitioner's First Amended

23  Petition more liberally as it was drafted by counsel.  (Doc. No. 20 at 29); *see Knaubert v.

24  Goldsmith*, 791 F.2d 722, 729 (9th Cir. 1986) ("district court is required to construe a pro se

25  petition more liberally than it would construe a petition drafted by counsel").

26  In any event, even were the Court to consider the arguments raised on reply, the claim

27  lacks merit.  Under *Chapman*, "the test for determining whether a constitutional error is harmless

28  . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not

1  contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting

2  *Chapman*, 386 U.S. at 24).  Under this standard, this Court asks whether the Court of Appeal

3  applied *Chapman* in an "objectively unreasonable" manner, *see Lockye v. Andrade*, 538 U.S. 63,

4  75 (2003), meaning this court asks whether the "*harmlessness determination itself* was

5  unreasonable," *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original).  To meet this

6  standard, Petitioner must show that the state court's decision to reject his claim "was so lacking in

7  justification that there was an error well understood and comprehended in existing law beyond

8  any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.  To do so, Petitioner must

9  show that the evidence admitted had a "substantial and injurious effect or influence in

10  determining the jury's verdict." *Brecht*, 507 U.S. at 62.

11      Here, the state appellate court found the admission of Malley's testimony was harmless

12  beyond a reasonable doubt even though the court found that some of his gang expert testimony

13  was based on hearsay.  (Doc. No. 21-1 at 35-40).  Specifically, the state court noted that a

14  significant amount of Malley's testimony was admissible, including how the charged crimes

15  benefited the Country Boy Crips and analysis of the wiretapped conversations detailed above,

16  which was also admitted into evidence and played for the jury, demonstrated that Petitioner was

17  consistently involved with the Country Boy Crips and that the July shooting was gang related.

18  (*Id*. at 39).  The jury also heard testimony from Taylor that Petitioner was a Country Boy Crip,

19  and there was evidence of Petitioner's admissions to D. and M.G. that the March shooting had a

20  gang-related purpose.  (*Id*. at 39-40).  Based on the foregoing, the Court of Appeal concluded that

21  considering the other properly admitted evidence "the trial court's error in admitting those

22  portions of Malley's testimony consisting of case-specific hearsay and case-specific testimonial

23  hearsay was harmless under either the *Watson* or the *Chapman* standard."  (*Id*. at 40).

24      In his reply, Petitioner argues that the state court's application of *Chapman* was

25  unreasonable.  (Doc. No. 29 at 33-42).  Specifically, Petitioner argues that the introduced wire-

26  tapped calls did not offer substantial evidence of Petitioner's gang affiliation or gang-related

27  motive for the shootings, and the testimony from Taylor and the other witnesses had "massive

28  credibility problems" and did not amount to substantial evidence of Petitioner's gang affiliation.

(*Id*.).  Petitioner contends had the jury not heard the "significant volume" of inadmissible testimony from Malley, "it would not have been able to find Rogers guilty beyond a reasonable doubt as to the gang offenses or find true the gang enhancements and special circumstance." (*Id*. at 42).

Applying § 2254(d) deferential standard, the undersigned cannot find that the state appellate court's harmless error determination was unreasonable.  There was ample non-hearsay testimony and evidence upon which the jury could find that Rogers was a Country Boy Crip gang member.  Petitioner fails to show how Malley's testimony had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 62.  In summary, Petitioner fails to demonstrate that the state court's rejection of his Sixth Amendment confrontation claim was contrary to clearly established law or based upon an unreasonable determination of the facts considering the evidence presented.  Thus, the undersigned finds the confrontation issue raised in ground one is without merit and should be denied.

As to his "alternative" ineffective assistance of counsel claim, the state appellate court found that, even "were we to find the issue forfeited by defense counsel's failure to object, defendant's ineffective assistance of counsel claim would fail for lack of prejudice.  To establish prejudice on such a claim, a defendant must show a reasonable probability – that is, "'a probability sufficient to undermine confidence in the outcome'" – of a more favorable result absent counsel's shortcomings.  Where, as here, an error can be declared harmless beyond a reasonable doubt; no such probability exits." (Doc. No. 21-1 at 40 n.26) (internal citations omitted) (citing *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984) (under the second part of *Strickland's* two-prong test, the petitioner must show that he was prejudiced by counsel's conduct)).

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (judicial review of counsel's representation is "doubly deferential when it is conducted through the lens of federal habeas").  When § 2254(d) applies, the "question is not whether counsel's actions were

1   reasonable.  The question is whether there is any reasonable argument that counsel satisfied

2   *Strickland's* deferential standard."  *Richter*, 562 U.S. at 105.  Even in his reply, Petitioner's offers

3   only the conclusory assertion that "trial counsel's failure to object to the introduction of

4   inadmissible hearsay fell below the standard of a reasonable attorney resulting in prejudice."

5   (Doc. No. 29 at 22-25).  This is insufficient.  The undersigned finds the state appellate court's

6   decision that Petitioner could not demonstrate prejudice for trial counsel's failure to object to

7   Malley's testimony considering that the admitted hearsay evidence was declared harmless beyond

8   a reasonable doubt, was not contrary to, or an unreasonable determination of, clearly established

9   law, nor was it based on an unreasonable determination of the facts in light of the evidence

10  presented.  Thus, the undersigned recommends that the ineffective assistance of counsel claim in

11  ground one be denied as without merit.

12          **B. Ground Two: Equal Protection**

13                  **1. Background**

14          As his second ground, Petitioner summarily states that California Penal Code deprives

15  him of his rights to equal protection under the Fourteenth Amendment and to be free from cruel

16  and unusual punishment under the Eighth Amendment.  (Doc. No. 14 at 7).  Again, Petitioner

17  articulates the following scant facts in support of his claim:

18              Penal Code section 3051 provides for a youthful offender parole
                hearing in the 25th year of incarceration for offenders who
19              committed their crimes while under the age of 25 and were
                sentenced to 25 years to life.  Petitioner was 23 years old at the time
20              of his crimes of conviction.  He is similarly situated to those
                defendants eligible for a youthful offender hearing under Penal
21              Code section 3051, but for his LWOP sentence on his controlling
                offense (Count one).
22

23  (*Id.*).[3]  In its Answer, Respondent argues "there is no Supreme Court case that precludes a state

24  _____

25  [3] California Penal Code § 3051 established a procedure for some offenders to obtain a youth offender
    parole hearing.  Under the statute, an inmate is eligible for a youth offender parole hearing if they were (1)
26  less than 18 years old at the time of their offense and sentenced to LWOP or less, or (2) between 18 and 25
    years old at the time of their offense and sentenced to less than LWOP.  Cal. Penal Code § 3051(b).  "The
27  purpose of section 3051 is 'to account for neuroscience research that the human brain – especially those
    portions responsible for judgment an decisionmaking – continues to develop into a person's mid-20s."
28  *Jackson v. Macomber*, 2023 WL 4750815, at *3 (citing *People v. Wilkes*, 46 Cal. App. 5th 1159, 1166
    (2020)).

31

1   legislature from restricting parole eligibility for young adults, and California appears to have a

2   rational basis for enacting § 3051(h).  (Doc. No. 20 at 30-34).  Respondent further contends that

3   the state court could have reasonably denied relief on equal protection and cruel and unusual

4   punishment theories.  (*Id*. at 31-34).

5       As above, Petitioner improperly expanded on his second ground for relief in his reply,

6   arguing that § 3051 violates his rights to equal protection because it allows inmates sentenced to

7   life without parole (LWOP) for crimes committed under the age of 18 to be considered for

8   youthful offender parole, but denies that consideration to inmates sentenced to LWOP for crimes

9   committed between the ages of 18 and 25.  (Doc. No. 20 at 47).  In particular, Petitioner argues

10   that (1) he is similarly situated to juveniles convicted of LWOP sentences and to individuals

11   convicted of serious non-LWOP offenses who also receive youthful offender parole consideration

12   according to the "scientific rationale" accounting for cognitive development for offenders until

13   age 25; and (2) there is no rational basis for treating him differently than inmates who were

14   juveniles at the time of their offense or received lesser punishment.  (Doc. No. 29 at 46-60).

15   Petitioner also added a single page of argument addressing his cursory argument that the

16   imposition of LWOP for crimes committed when he was 23 violates his right to be free of cruel

17   and unusual punishment under the Eighth Amendment.  (*Id*. at 61).

18                    **2. Petitioner is not Entitled to Relief**

19       As an initial matter, the "habeas statute unambiguously provides that a federal court may

20   issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in

21   violation of the Constitution or laws or treaties of the United States.'"  *Wilson v. Corcoran*, 562

22   U.S. 1, 5 (2010) (per curiam) (quoting 28 U.S.C. § 2254(a)).  If a prisoner's claim "would

23   necessarily demonstrate the invalidity of confinement or its duration," a habeas petition is the

24   appropriate avenue for the claim.  *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005).  In contrast, if a

25   favorable judgment for the petitioner would not "necessarily lead to his immediate or earlier

26   release from confinement," he may assert his claim only under 42 U.S.C. § 1983.  *Nettles v.*

27   *Grounds*, 830 F.3d 922, 935 (9th Cir. 2016).  In *Nettles*, the Ninth Circuit, in analyzing Supreme

28   Court precedent distinguishing relief available via § 1983 or habeas corpus, concluded if a state

1    prisoner's claim does not lie at "the core of habeas corpus," meaning where success on a claim

2    would not necessarily lead to an immediate or speedier release, then the claim "may not be

3    brought in habeas corpus but must be brought, 'if at all,' under § 1983." *Id*. at 931 (quoting

4    *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973); 93 S. Ct. 1827 (1973); *Skinner v. Switzer*, 562

5    U.S. 523, 535 (2011).

6          District courts in California have consistently held that an equal protection challenge to

7    eligibility for a youth offender parole hearing under § 3051, as asserted here, is not cognizable on

8    habeas corpus because a favorable resolution of the claim wouldn't necessarily lead to a speedier

9    release from prison; rather, it would lead to a youth offender parole hearing after which a

10   petitioner may or may not be granted parole. *See, e.g., Jackson v. Macomber*, 2023 WL 4750815,

11   at *4 (S.D. Cal. Jul. 25, 2023); *Saesee v. Lynch*, 2023 WL 3380100, at *2 (E.D. Cal. Apr. 25,

12   2023) ("[b]ecause petitioner seeks only to be granted a youth offender parole hearing, at which he

13   may or may not be granted parole, success on the merits of the petition will not guarantee his

14   speedier release and this court lacks [habeas] jurisdiction"); *Turner v. Foss*, 2020 WL 3971599, at

15   *3 (S.D. Cal. Jul. 14, 2020) (finding equal protection challenge to § 3051 not cognizable on

16   habeas but noting some courts have found an equal protection claim is within the core of habeas

17   corpus when paired with a request to be resentenced pursuant to California Penal Code §

18   1170(d)(2)); *Johnson v. Lozano*, 2020 WL 959253 (C.D. Cal. Jan. 17, 2020), *adopted*, 2020 WL

19   949953 (C.D. Cal. Feb. 26, 2020) (no federal habeas jurisdiction where petitioner claimed

20   administration of California Penal Code § 3105 violated the Equal Protection clause of the

21   California Constitution because "[e]ven if he were afforded a parole hearing, Petitioner still

22   would not be entitled to immediate release or a shorter prison stay."). Remarkably, Petitioner

23   appears to concede this point in his reply, arguing that "[e]ven if this Court were to agree with

24   Rogers and conclude that his constitutional right to Equal Protection demands that he have the

25   opportunity to go before California's Parole Board at some future date, this is not a guarantee he

26   will be released." (Doc. No. 29 at 60). Thus, regardless of AEDPA deference, the Court has no

27   jurisdiction under § 2254 to consider Petitioner's equal protection challenge to § 3051.

28         Moreover, as argued by Respondent, no Supreme Court case has addressed equal

1    protection challenges to § 3051, thus, Petitioner's equal protection claim cannot be contrary to or

2    an unreasonable application of clearly established Supreme Court precedent.  (Doc. No. 20 at 30-

3    31); *Knowles*, 556 U.S. at 122 ("it is not an unreasonable application of clearly established

4    Federal law for a state court to decline to apply a specific legal rule that has not been squarely

5    established by [the Supreme Court].") (internal quotations omitted).  And finally, even were it to

6    consider Petitioner's equal protection claim on the merits, the Court notes several district courts

7    have recently found no violation of equal protection rights where petitioner made similar

8    arguments that he was similarly situated to offenders who were eligible for youth offender parole

9    hearings under § 3051 but was being treated differently.  *Jackson*, 2023 WL 4750815, at *4-8

10    (state court's denial of claim that ineligibility for a youth parole hearing under § 3051 violates the

11    equal protection clause because he was treated differently than other youthful offenders aged 18-

12    25 sentenced to less than LWOP, and juvenile offenders sentenced to LWOP, was not contrary to

13    or an unreasonable application of clearly established Supreme Court law); *Turner*, 2020 WL

14    3971599, at *5 ("California decided to deny youthful parole hearings to individuals who

15    committed crimes serious enough to receive a sentence of [LWOP] after reaching the age of 18

16    while granting hearings to those who were under the age of 18 when they committed their crimes.

17    This decision is rationally related to the states goal of releasing on parole those individuals who

18    are most likely to succeed on parole, not reoffend and successfully rehabilitate.").

19          Finally, Petitioner's entirely cursory argument that the imposition of a LWOP sentence for

20    crimes committed when he was 23 is cruel and unusual punishment in violation of the Eight

21    Amendment is without merit.  Petitioner relies on Supreme Court case law addressing the Eight

22    Amendment's prohibition on cruel and unusual punishment as it applies to juvenile offenders in

23    *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010) and *Miller v.*

24    *Alabama*, 567 U.S. 460, 465 (2012), but he does not, and cannot, cite any case law to support his

25    argument regarding offenses committed by non-juvenile offenders.  (Doc. No. 29 at 61).  In fact,

26    he concedes in his reply that there is no Supreme Court case that prohibits the imposition of a

27    LWOP sentence for a crime committed when the offender was 23 years old.  (*Id.*); *see Adams v.*

28    *Frauenheim*, 2018 WL 3046939, at *8 (N.D. Cal. June 14, 2018) ("Regardless of California's

1  treatment of young adult offenders, the U.S. Supreme Court has not determined that young adult

2  offenders have a right to the same consideration as juvenile offenders for sentencing purposes.

3  The decision of the California legislature in drawing some lines at 18 and others at 25 does not

4  change the parameters of the Eighth Amendment.").  Thus, rejection of Petitioner's Eighth

5  Amendment claim by the state court cannot be contrary to or an unreasonable application of

6  clearly established law as determined by the United States Supreme Court.

7       The undersigned recommends that ground two be denied as without merit.

8                      **IV.  CERTIFICATE OF APPEALABILITY**

9       A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

10  court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

11  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

12  district court to issue or deny a certificate of appealability when entering a final order adverse to a

13  petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

14  Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

15  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

16  the petitioner to show that "jurists of reason could disagree with the district court's resolution of

17  his constitutional claims or that jurists could conclude the issues presented are adequate to

18  deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

19  *McDaniel*, 529 U.S. 473, 484 (2000).  Here, Petitioner has not made a substantial showing of the

20  denial of a constitutional right.  Thus, the undersigned recommends that the court decline to issue

21  a certificate of appealability.

22       Accordingly, it is **RECOMMENDED**:

23       1.  Petitioner be denied all relief on his First Amended Petition.  (Doc. No. 14).

24       2.  Petitioner be denied a certificate of appealability.

25                          **NOTICE TO PARTIES**

26       These findings and recommendations will be submitted to the United States district judge

27  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen (14)

28  days after being served with these findings and recommendations, a party may file written

objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Dated:    August 29, 2023

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE